# GOLD *v.* GOLD. (1)

---

PATENTS; INTERFERENCE; CLAIMS AND SPECIFICATIONS; DRAWINGS; CONCEPTION AND DISCLOSURE.

1. Where the Commissioner of Patents awards priority as to certain claims to one of the parties to an interference and to the other party as to other claims, and one of them appeals, this court will assume that there was a patentable difference between the two groups of claims.

2. Where, in an interference involving an improvement in an automatic locking device for hose couplings, the senior party stated in his specifications that to provide the upper side of his locking pin with a "short inclined face" would permit automatic coupling of the device, it was *held*, reversing a decision of the Commissioner of Patents that the disclosure did not justify the claims, that the failure to state the angle of inclination was immaterial, as it would appear to any one

skilled in the art that the specifications and drawings would imme-
diately suggest an automatic coupler.

3. Failure by one of the parties to an interference to make the claims of
the issue until the filing of his adversary's application cannot affect
his rights, where his specifications and drawings disclose the inven-
tion. (Following *Lotz* v. *Kenney*, 31 App. D. C. 205.) He is entitled
to every use to which his invention is susceptible although such use
be known or unknown to him.

4. An applicant's specifications and drawings must be construed in the light
of the prior art.

5. Patent Office drawings are not working drawings. Their object is to
aid in conveying to one skilled in the art the idea of the inventor.

6. Where, in an interference involving an improvement in a locking device
for hose couplings, the Commissioner awarded priority to the senior
party as to certain claims and to the junior party as to other claims,
and the senior party appealed, it was *held,* on a review of the evi-
dence, which showed among other things that the junior party who
claimed to have conceived the invention prior to the date when he
saw the senior party's device at a public exhibit of allied devices,
that his testimony was vague and indefinite as to the date of his
conception, and also that the evidence showed that he had done
practically nothing for about two years towards reducing the inven-
tion to practice, while the senior party was diligent, and that the
senior party was therefore entitled to an award of priority.

No. 583. Patent Appeals. Submitted November 11, 1909. Decided Decem-
ber 7, 1909.

HEARING on an appeal from a decision of the Commissioner
of Patents in an interference case.              *Reversed.*

The facts are stated in the opinion.

*Mr. Otto R. Barnett* for the appellant.

*Mr. Arthur C. Fraser* and *Mr. William A. Redding* for the
appellee.

Mr. Justice Robb delivered the opinion of the Court:

This is an appeal from a decision of the Commissioner of Patents in an interference proceeding, awarding priority of invention, as to certain claims, to the junior party, Edward E. Gold, on the ground that the senior party, Egbert H. Gold, has no right to make the claims.

The invention is a narrow one, and resides in an improvement consisting of an auxiliary locking device for hose couplings in heating systems for railroad cars. The counts here in issue are five, and are as follows:

"1. A direct port, gravity hose coupler for railway cars, having a locking arm on one side and a locking projection the opposite side, adapted to couple with its reciprocal coupler by a downward, swinging movement, and to automatically uncouple with an upward movement by the tautening of the hose as the cars draw apart, combined with auxiliary locking means arranged to resist, but not to prevent, the uncoupling movement of the members of the coupling.

"2. A direct port, gravity hose coupler for railway cars, having a locking arm on one side and a locking projection on the opposite side, adapted to couple with its reciprocal coupler by a downward, swinging movement, and to automatically uncouple with an upward movement by the tautening of the hose as the cars draw apart, combined with a spring latch impositively engaging the reciprocal coupler and resisting, but not preventing, the uncoupling movement.

"3. A direct port, gravity hose coupler for railway cars, comprising reciprocally-engaging heads having locking means, comprising a lug on one side of each head and an arm on the opposite side formed with a hook for engaging the lug on the other head, adapted to coupler by a downward, swinging movement, to hold the heads coupled against internal pressure during normal running, and to uncouple automatically with an upward movement by the tautening of the hose as the cars draw apart, combined with an auxiliary spring latch on one head impositively engaging the other head, and adapted in co-operation

with said locking means to resist the uncoupling movement sufficiently to prevent accidental uncoupling, but not sufficient to prevent automatic uncoupling, as the cars draw apart.

"4. A direct port, gravity hose coupler for railway cars, comprising reciprocally-engaging heads having locking means comprising a lug on one side of each head and an arm on the opposite side formed with a hook for engaging the lug on the other head, adapted to couple by a downward, swinging movement, to hold the heads coupled against internal pressure during normal running, and to uncouple automatically with an upward movement by the tautening of the hose as the cars draw apart, combined with an auxiliary spring latch on one head impositively engaging the other head to resist the uncoupling movement, and adapted to be displaced by said movement against the stress of its spring.

"5. A direct port, gravity hose coupler having locking, means comprising a lug on one side of its head and on the other side a hooked locking arm adapted to engage such lug on a mating coupler, combined with an auxiliary impositive spring latch engaging the opposite head, the engaging faces being relatively shaped to press back said latch against the stress of its spring during the uncoupling movement, the said latch adapted in cooperation with said locking means to resist the uncoupling movement sufficiently to prevent accidental uncoupling, but not sufficiently to prevent automatic uncoupling as the cars draw apart."

It will be observed that the invention sought to be covered in these five counts is directed to the feature of having the locking device so arranged as to hold the parts of the coupler together under ordinary strains, and allow them to become separated or uncoupled under more severe strains. This feature has been aptly described by appellee in his application, in which the claims originated, as an "impositive" lock.

The Commissioner awarded priority to appellant as to three counts, of which the following is typical:

"6. A direct port, gravity coupling comprising reciprocal coupling members, having each a head with an external lock-

ing arm on one side and an external locking projection on the opposite side, combined with a spring latch on one member adapted to engage the opposite member, there being two pairs of engaging faces on said member and latch, one of the engaging faces of one pair being inclined, whereby the said latch is automatically forced back in the operation of coupling, and one of the engaging faces of the other pair being inclined, and both of said faces being transverse to the direction of movement of the members in coupling and uncoupling, whereby the spring pressure tends to force the members in the direction of coupling after the coupling is made."

An examination of the counts awarded appellant, from which award no appeal was taken, shows that there is not necessarily any difference between the structure called for by these counts and the structure called for by the six counts awarded appellee. The difference, if any there be, is confined to the angle of the inclination of the under cam face of the bolt constituting the locking device and the strength of the spring actuating the bolt. But we must here assume that there is a patentable difference between the two groups of claims.

It is conceded that when these parties entered the field couplers of the Sewell type were in general use. These couplers were automatic in operation, and comprised two interlocking members, from the body of each of which projected an arm which interlocked with the undercut lug of the opposite side of the body of the other member, and a neck extending slantingly upward, to which the hose was attached. The construction of this coupler was such that it was maintained in position by gravity, and uncoupled by a strong longitudinal pull on the depending hose, or by a sudden central upward pull. Hence if cars of the train became accidentally separated the couplings became disengaged without rupturing the hose. It was found, however, that as the cars were made longer and the hose used in connection with the coupling heavier, sharp and, especially, reverse curves produced lateral movement between adjacent car ends which tightened the hose sufficiently to disengage the coup-

lers. Appellant, who was highly skilled in the art, sought to overcome this defect. His application was filed April 10th, 1902. He made drawings of his invention in December, 1901, and disclosed it to others in January, 1902. The application of appellee was not filed until June 24th, 1903.

In his specification appellant says: "To prevent the accidental uncoupling of my device, I provide the lock shown in Figs. 3 and 4. This lock consists of a locking pin provided with an arm and mounted within a transverse recess in the coupling. This recess is so located that, when the coupling members are clamped together, the pin, projecting from the recess, will engage the upper edge of the arm of the coupling. The locking pin is normally forced outwardly in a position to lock with the arm, by means of a spring, in any suitable manner * * * the pin may be provided with a *short-inclined face* at the upper side of its forward end, as shown in Figs. 3 and 4, in which event it may be first released and then, as the coupling is clamped together, the under edge of the arm will engage this inclined or wedged face, *thereby forcing the pin backwardly sufficient to allow the passage of the arm.* Whereupon it will immediately return to its locking position in engagement with the upper side of the arm.

"I also preferably provide the under face of the forward end of the pin with a long inclined face, extending backwardly at such an angle that the upward pressure of the arm against said face will not tend to force the pin backwardly, but, on the contrary, the combined action of the spring, and this long inclined under face will be to constantly wedge the pin against the upper face of the arm, and hold the coupling in a tightly locked position at all times."

Accompanying this specification was a drawing showing a spring-actuated pin on the coupler head. The upper side of this pin is wedge-shaped, as indicated in the specification, and there is no question that the angle is such as readily to permit the automatic coupling of the device. The under side of the pin is cut away at a more obtuse angle. In other words, as the specification suggests, it was provided with a long inclined

face. There is testimony in the record, which, we think, has not been successfully met, to the effect that couplings equipped with a locking device constructed in accordance with this drawing, would uncouple automatically.

In May, 1902, appellant had constructed several couplings clearly embodying the subject-matter of the issue. One of these couplings was publicly exhibited by him at the Master Car Builders' Convention in Saratoga, N. Y., in June, 1902. Appellee was within two feet of the exhibit and carefully examined it. In the brief of counsel for appellee it is said: "It is clearly established that E. H. Gold, in May and June, 1902, had the Crane Company make for him the couplers offered as 'Egbert H. Gold, Saratoga Exhibit.'. These couplers have spring bolts with very weak springs, and with beveled heads. E. H. Gold was then under great pressure to produce some kind of a coupler that he could offer to his customers. The couplers he made would hardly stay coupled at all without spring bolts; and even with these the couplers uncouple so easily as to be fully as liable to uncouple accidentally as the Edward E. Gold coupler without any lock."

It will thus be seen that long prior to appellee's filing date appellant had constructed a device which appellee's counsel now says was too automatic. It conclusively appears, therefore, that the very first embodiment of appellant's structure, which he publicly exhibited, was an automatic coupler. His claims, as originally drawn, however, did not cover this feature, and it was not until an interference on a related subject-matter had exposed the application of appellee that such claims were inserted. The Examiner finally rejected the claims as not warranted by the disclosure of appellant, and upon an *ex parte* appeal to the Board of Examiners-in-Chief the decision was reversed, one member dissenting. Thereupon the present interference was declared, and appellee moved to dissolve, contending that appellant had no right to make the claims. The Examiner denied the motion and the case was again taken to the Examiners-in-Chief, on the motion that the Board recommend the rejection of appellant's claims under Rule 126. This rec-

ommendation the Board declined to make, saying that "if Edward E. Gold can show that the latch, as originally described and shown by Egbert H. Gold, is a 'positive' latch, and will not yield to unusual strains transmitted through the coupling, he may secure an adjudication of the question involved at the final hearing in connection with the main question of priority." The decision of the Examiner of Interferences, upon final hearing, was in favor of appellee, but it turned upon another point. The personnel of the Board of Examiners-in-Chief had changed when the final hearing was had before that tribunal. Upon that hearing a majority of the board ruled that appellant had no right to make the claims of the issue, and this finding was affirmed by the Commissioner.

We incline to the view that the conclusion reached by the Commissioner is based upon a too technical and illiberal consideration of appellant's case. We are convinced that the subject-matter of the issue was disclosed in the specification and drawings of appellant. It will be remembered that the angle of the upper side of the locking pin, as shown in the drawing, and as described in the specification, readily permitted the automatic coupling of the device. The angle on the under side of the pin was longer. Experts have subjected a coupler equipped with a locking pin, having the angles described in the specifications and shown in the drawings, to tests, and these tests have demonstrated that the lock was not a positive lock; in other words, that the coupler was automatic. The angle on the upper side of the pin was designed to withstand slight resistance only; the angle on the under side much greater resistance. But to anyone skilled in the art the specification and drawings would immediately suggest the automatic coupler. It seems to us that any other conclusion almost amounts to an absurdity. The bolt was there; the spring was there; their position was correct. As the coupler was clamped together the upper bevel of the pin engaged the under edge of the arm of the coupling, the pin was readily forced back, thereby permitting the passage of the arm. Whereupon the pin receded or assumed its normal position and the coupler was locked. Ex-

actly the same principle is invoked in uncoupling the coupler. Anyone skilled in the art would know at a glance that to subject the hose to a longitudinal pull would tend to tilt up the ends of the arms of the coupler, and bring the upper edge of these arms into engagement with the under beveled edge of the pin. It is also apparent that to withstand a pressure of one hundred pounds a certain bevel or angle would be necessary, and that to withstand a greater pressure a different angle would be required. The angle shown in appellant's drawing was designed to withstand severe strains. The angle finally adopted by him is, as above noted, criticized because it did not withstand greater strains. As we view it, this is not a question of angles so much as it is one of ideas. In other words, did appellant's specification and drawings disclose the inventive thought?

The failure of appellant to make the claims of the issue until after the filing of his adversary's application cannot affect his rights in the circumstances of this case. *Lotz* v. *Kenney,* 31 App. D. C. 205; *Cleveland Foundry Co.* v. *Detroit Vapor Stove Co.* 68 C. C. A. 233, 131 Fed. 853. In the latter case the court, after pointing out the distinction between allowable amendments and those not allowed said: "This distinction harmonizes with the doctrine that the benefit secured by an invention extends to all the uses of which it is capable, whether the inventor had them all in contemplation or not, and the other rule, to which we have already referred, that it does not matter that he does not understand the principles on which his device operates. If he discovers new uses to which his invention may be put, or discerns the principles thereof more clearly, while his application is pending, in neither case is there any new invention, nor any enlargement of the old. And, that being so, there can be no legal objection to his so molding his claims as to secure all his invention discloses."

In *C. & A. Potts & Co.* v. *Creager,* 155 U. S. 606, 39 L. ed. 278, 15 Sup. Ct. Rep. 194, the court said: "Doubtless a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him."

It must be remembered that appellant was seeking to improve an automatic coupler, and that his specification and drawings must be construed in the light of the prior art. In the decision of the Board of Examiners-in-Chief on final hearing they said: "An inspection of the drawings of the senior party discloses a spring pressed bolt for securing the sections of his coupling in locked position, the nose of the bolt chamfered or cut away on its upper and lower sides. So far as the drawing shows the bolt might form the impositive lock of this issue if we assume (1) that the angle of inclination of the cam face of the bolt is such as to permit it to be forced back by the member with which it coacts, and (2) that the spring is of such strength, in view of the angle of the cam face of the bolt, as to yield to the movement of the members of the coupling only when a strain is put upon it, less than would injure the hose and its connections and greater than that to which it might be accidentally subjected. Neither of these conditions is expressed in the drawing. The strength of the spring it is obviously impossible to represent. It is also impossible to tell from the angle shown whether a device constructed in exact accord with the drawing would have the function here in issue or not."

This criticism of appellant's drawings is based upon the proposition that he is restricted to the exact angle there shown. Manifestly Patent Office drawings are not working drawings. Their object is to aid in conveying to one skilled in the art the idea of the inventor. When the inventor in this instance stated in his specification that to provide the upper side of the end of the locking pin "with a short inclined face" would permit the automatic coupling of the device and showed a longer inclined face on the under side of the end of the pin which was capable, under severe strains, of automatic operation, he disclosed this invention. The angle of inclination could be varied to meet the requirements of service. Any mechanic could do that. The invention has been greatly magnified, for, after all, it is a very simple thing and amounts to little more than putting an old device to a new use. Locking pins of various forms were old, but they had not been applied to automatic couplers.

Appellant conceived the idea of so applying them. He knew, as everyone skilled in the art knew, that there must be little resistance to the clamping together of the coupler. Consequently he cut away the upper cam face of the locking pin at an acute angle. It was also perfectly well known to him that to overcome the liability to accidentally uncouple a more obtuse angle would be necessary on the under cam face of the pin. His drawings show a coupler equipped with a locking pin permitting automatic operation. We think it logically follows from what we have said that appellant was entitled to make the claims of the issue.

As previously stated, appellant has been awarded priority as to three claims. Exactly the same testimony was involved in the determination of the question of priority as to the claims of the issue. Since the two groups of claims are so closely related, and as appellee has taken no appeal from the adverse decision of the Commissioner, as to one group of claims, he is not in a very good position to urge the question of priority as to the other group. We have, however, examined the testimony bearing upon this question, and we are not convinced that appellee, when he saw the embodiment of appellant's structure at Saratoga in June, 1902, had then conceived this invention. The testimony of appellee himself on this point is very vague and indefinite. He produced the workman who made the spring used in the experimental device who testified, purely from memory, that it was made in the summer of 1901, and "in the very hot weather." He also produced a witness who testified that he saw this experimental coupler when he took the 1902 inventory, that his attention was not directed to it, and that it was in a box containing twenty-five or thirty pieces of castings. The memory of this witness is so remarkable as to be unreliable. When the vagueness of appellee's testimony on this point is considered, and the fact that in June, 1902, he saw appellant's device under such conditions as must have disclosed its novel features to him, the conclusion is almost irresistible that the very hot weather mentioned by the witness who made

D. C.]                         Syllabus.

the experimental spring was in July, 1902, and after appellee's return from the Saratoga Convention.

But accepting appellee's contention that he conceived the invention in 1901 we agree with the Examiners-in-Chief and the Commissioner that he was lacking in diligence. According to his own testimony practically nothing was done toward reducing the invention to practice between 1901 and June 24th, 1903, when he filed his application. Since the evidence clearly shows that appellant conceived the invention in December, 1901, and was diligent thereafter in reducing it to practice, it follows that the decision of the Commissioner is reversed.

The clerk will certify this opinion as by law required.

*Reversed.*

A motion by the appellee for a rehearing was overruled January 5, 1910.